## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

JENNIFER J. DEMARCO,

                                        Plaintiff,

                -vs-                                        DECISION and ORDER
                                                           06-CV-6187-CJS
COOPERVISION, INC.,

                                        Defendant.

---

### APPEARANCES

For Plaintiff:                          Robert B. Moriarty, Esq.
                                        Moriarty & Dee
                                        1109 Delaware Avenue
                                        Buffalo , NY 14209
                                        Tel: (716) 881-6400

For Defendant:                          Daniel J. Moore, Esq.
                                        Harris Beach LLP
                                        99 Garnsey Road
                                        Pittsford , NY 14534
                                        Tel: (585) 419-8626

### INTRODUCTION

**Siragusa, J.**   This employment discrimination case is before the Court on Defendant CooperVision, Inc.'s ("CooperVision") motion for summary judgment seeking dismissal of the complaint. For the reasons stated below, the motion is granted.

### BACKGROUND

On April 7, 2006, plaintiff Jennifer J. DeMarco ("DeMarco"), filed this lawsuit against her former employer, CooperVision, alleging that on or about October 31, 2005, CooperVision terminated her employment and otherwise discriminated against her

because of: (1) her sex (pregnancy) in violation of Title VII the Civil Rights Act of 1964, as amended; (2) her sex (pregnancy) in violation of the New York human rights Law, New York executive Law section 296 *et seq*.; (3) her disability in violation of the Americans with disabilities act, 42 U.S.C. § 12111 *et seq*.; and (4) her disability in violation of the New York human rights Law, New York executive Law section 296 *et seq*.

DeMarco started working for CooperVision in September 2000 in the position of marketing executive assistant, providing secretarial support to the vice president of marketing, Thomas Shone ("Shone"). (DeMarco Dep., at 25.) DeMarco was an "at will" employee (DeMarco Dep., at 29-30) and was provided with a CooperVision employment handbook containing the company's policy for Family and Medical Leave Act[1] ("FMLA") leave. CooperVision's policy provided that an eligible employee could take a total of twelve weeks of FMLA leave during any twelve-month period to address such issues as her own serious health condition or the birth of a child.[2] (Employee handbook receipt (Oct. 15, 2004), attached as Ex. 8 to Defendant's statement of material facts.)

DeMarco was promoted to the position of marketing coordinator in April 2001. (DeMarco Dep., at 36; CooperVision employee action sheet (Apr. 2, 2001), attached as Ex. 10 to Defendant's statement of facts.) Then, in March 2002, DeMarco was promoted

---

[1] P.L. 103-03 (Feb. 5, 1993), codified at 29 U.S.C. § 2601, *et seq*.

[2] "An employer covered by the FMLA is required to grant an 'eligible employee' up to 12 weeks of leave during any 12-month period for, *inter alia*, 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.' 29 U.S.C. § 2615(D)." *Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp. 2d 63, 79 -80 (N.D.N.Y. 1999).

to associate product manager, reporting to marketing manager Steve Gandola. (Letter from Rona Jean Sembach to Jennifer DeMarco (Mar. 4, 2002), attached as Ex. 11 to Defendant's statement of facts; DeMarco Dep., at 36-37.)

DeMarco was promoted again, in October 2002, to the position of marketing promotions manager. (CooperVision employee action sheet (Oct. 28, 2002), attached as Ex. 12 to Defendant's statement of facts; DeMarco Dep., at at 41.) In that position, one of DeMarco's primary responsibilities was to manage CooperVision's trial rack pro-grams. Through those programs, CooperVision distributed racks of free promotional contact lenses to doctors. In that regard, DeMarco ensured that the trial racks were being distributed to the proper salespeople, and she accounted for them. In addition, she was responsible for ordering those racks from the manufacturer and ensuring CooperVision had sufficient inventory to cover the marketing department's promotional needs. (DeMarco Dep., at 46-58.) A further responsibility in her new position was to manage CooperVision's customer rebate and key account programs. As to these, she worked with eye care centers, such as LensCrafters® and Eye Care Centers of America, Inc.™, regarding marketing issues. (DeMarco Dep., at 46-58.) At her deposition, DeMarco estimated that she spent about 40 percent of her time on the trial racks and rebates.

In 2004, CooperVision President Jack Gibson directed a reorganization of the finance and marketing departments to create a department called commercial finance. As a result of CooperVision's growth, many of the marketing department's promotions, including the trial racks of lenses, began to require a large expenditure of funds, and the commercial finance department was created to give the company tighter control over

such expanding costs. (Menard Aff. ¶ 5, attached as Ex. 2 to Defendant's statement of facts; Shone Aff. ¶ 7, attached as Ex. 3 to Defendant's statement of facts.) On August 16, 2004, DeMarco successfully applied for the position of commercial finance program manager. (Personal history and skills inventory (Aug. 16, 2004), attached as Ex. 13 to Defendant's statement of facts; DeMarco Dep., at 66-67; Menard Aff. ¶ 6.) As commercial finance program manager, she reported to the director of commercial finance, Josh Stern. (*Id*.) Further, while DeMarco continued to exercise the same job functions she had previously performed, she also oversaw the work of an analyst, Monica Buholtz ("Buholtz"), and exercised additional control over promotional costs. (Bernard Aff. ¶ 6; Shafer Aff. ¶ ¶ 10, 11; DeMarco Dep., at 74.)

In January 2005, CooperVision acquired Ocular Science, Inc. [sic][3] ("OSI"), and began the process of integrating the job operations of the two companies. (Bernard Aff. ¶ ¶ 19-20; Shone Aff. ¶ 14; exhibit 14 to Defendant statement facts.) OSI and Cooper-Vision both had a worldwide presence, and OSI had revenues of $310 million per year and more than 2,500 employees. As a result of the acquisition, CooperVision knew that a number of positions would need to be eliminated to eradicate redundancies. (Bernard Aff. ¶¶ 10-11; Shone Aff. ¶ 14.)

Moreover, in early 2005, CooperVision appointed David Shaffer to take over from Josh Stern as director of the commercial finance department. In March, Schaffer reviewed the department's operations with Shone and Menard and restructured it to

---

[3]In its statement of facts, Defendants refer to Ocular Science, Inc. According to Hoover's Company Records, the actual name of the company is Ocular Sciences, Inc. Hoover's Company Records, LexisNexis, The Cooper Companies, Inc., Description (Dec. 2, 2008).

eliminate nonfinance job functions.[4] (Menard Aff. ¶ 8; Shone Aff. ¶ 9-11; Shafer Aff. ¶ ¶ 5-8.) Neither DeMarco nor her subordinate, Buholtz, had any background in finance or accounting. Buholtz was terminated, and DeMarco, along with her nonfinancial duties, was transferred to the marketing administration department, where she acquired the title of marketing program specialist. In that department, she reported to Laurie Dodge, who was responsible for pricing and program management and marketing administration. (Bernard Aff. ¶ 16; Shone Aff. ¶ 18.) Shafer hired Jane Evans, who has an MBA in finance from the the Simon Graduate School of Business at the University of Rochester, to perform the finance duties DeMarco had previously performed, as well as other financial duties. (Shafer Aff. ¶ ¶ 11-13.) Following the restructuring, there were three departments within the new structure: sales administration; commercial finance; and marketing. Marketing was divided into: brand marketing managers, marketing administration and marketing support. (US Sales/Marketing/Finance Support Restructured March 2005, attached as exhibit 14 to Defendant's statement of facts.)

In her position as marketing program specialist, DeMarco no longer performed the finance functions she had in her previous position, but retained some of her marketing and administrative job functions. (Bernard Aff. ¶ 15; Shone Aff. ¶ 17; DeMarco Dep., at 80-81.) DeMarco expressed her concern to Michael Menard, the marketing department director, that since she no longer had managerial responsibilities, she was no longer eligible to receive a bonus. Menard worked with the vice president

---

[4]Shafer stated that he "wanted to insure that the finance operation was well defined in nonperforming functions that belonged elsewhere. I knew that if that were the case, it would be easier to avoid trouble." (Shafer Aff. ¶ 8, attached as Exhibit 4 to Defendant's statement of facts.)

for marketing and the human resources department to obtain an increase in DeMarco's salary. With her new salary, she then exceeded the amount she would have received had she been eligible for a bonus. (Bernard Aff. ¶ 17; Michael Menard e-mail message to Rona Sembach, March 22, 2005, attached as exhibit 15 to Defendant's statement of facts.)

On April 29, 2005, following the reorganization described above, DeMarco left CooperVision on maternity leave and received disability benefits as of May 2, 2005. (Letter from Cathy Sabatine, Senior Disability Benefits Specialist, Unum Life Ins. Co. of America to Dawn Roides and Jennifer DeMarco (May 20, 2005), attached as Ex. 16 to Defendant's statement of facts.) The provisions of the FMLA leave policy required that DeMarco's position be held open for 12 weeks. (Menard Aff. ¶ 18.) DeMarco was not cleared by her doctor to return to work until October 31, 2005, the date on which her disability benefits expired.[5] (FMLA Certification of Health Care Provider (Apr. 29, 2005), attached as Ex. 16 to Defendant's statement facts; prescription pad notes from Unity OB/GYN @ Clinton Crossings (Mar. 22, 2005 & Sept. 21, 2005), attached as Ex. 17 to Defendant's statement of facts; Letter from Cathy Sabatine, Senior Disability Benefits Specialist, Unum Life Ins. Co. of America to Dawn Roides and Jennifer DeMarco (Oct. 6, 2005), attached as Ex. 18 to Defendant's statement of facts.) In an April 25, 2005, email in response to one from Laurie Dodge (forwarding questions by Plaintiff about her long-term disability), which was also copied to Plaintiff, Dawn Roides stated:

---

[5]Plaintiff's twins were born on August 31, 2005. (DeMarco Dep. 128.) Two weeks after their birth, Plaintiff was no longer disabled. (*See* Demarco Dep., at 189.)

> As for job security I will reference the company policies.
>
> Policy 4.14 FMLA 5.B. An employee will return either to the same position she had before or to a position equivalent (same pay, benefits and working conditions). Keep in mind that FMLA if [sic] for the initial 12 weeks only. Position can be filled after 12 weeks with a permanent employee.
>
> Policy 4.11 STD 7. The maximum length of short term disability benefits is 26 weeks. Only upon prior administrative approval and only if consistent with the short term disability policy, may the length of short term disability leave be extended beyond 26 weeks.
>
> Since [Plaintiff] will be able to return close to the 6 month max mark you need to make a decision on reinstating her or not based on your department needs/status.

(Email from Dawn Roides to Laurie Dodge, copy to Jennifer DeMarco (Apr. 24, 2005, 12:42 PM), attached as Ex. 19 to Defendant's statement of facts.) In late April 2005, Plaintiff spoke with Shone about her concern that there would be a position for her when she returned. Shone informed Plaintiff there would be plenty of work for her when she returned, which he believed to be true as a result of the OSI integration. (Shone Aff. ¶ 19.) Shone later stated, in his affidavit, that he did not realize at the time of his conversation with Plaintiff that she would be out of work for six months. (*Id*. ¶ 20.) By September 2005, the job functions Plaintiff had performed were either eliminated, or had been absorbed into the duties of other employees. The position of marketing program specialist ceased to exist. (*Id*. ¶ 26.)

In September 2005, Janice Jones, Director of Human Resources for Cooper-Vision, consulted with Dodge, Menard and Shone regarding identifying an open position for Plaintiff when she was due to return the following month. Finding no open positions, Jones wrote to Plaintiff and advised her that no positions were open, and that she could apply for any open position in CooperVision on the date she was cleared to work,

October 31, 2005. (Letter from Janice Jones to Plaintiff (Sept. 27, 2005), attached as Ex. 22 to Defendant's statement of facts.) Plaintiff contacted Jones and received a list of all open positions at CooperVision, which consisted of: Billing Support Rep - Temporary position; Part time Customer Service Rep; Marketing Administrative Assistant; R&D, Global Business Solutions and IT technical positions. (Letter from Janice Jones to Plaintiff (Sept. 28, 2005), attached as Ex. 23 to Defendant's statement of facts.) Plaintiff did not express any interest in applying for an open position, and her employment was terminated effective October 31, 2005. (Jones Aff. ¶ 20; Compl. Ex. A, at 2.)

In response to interrogatories inquiring about the basis for Plaintiff's claims that she was terminated "because of her sex (pregnancy)," Plaintiff responded as follows:

Plaintiff had received five (5) promotions within five (5) years of employment with defendant. Plaintiff received positive performance appraisals and had been awarded bonuses.

On or about early April of 2005, shortly after plaintiff notified defendant of the possibility she would be going off work on early disability, defendant demoted plaintiff by removing her manager title along with bonuses and other perks commensurate with her position and many of her duties were distributed to other employees. Leading up to the plaintiff's disability leave, plaintiff was assured numerous times by Defendant that it had plenty of work available for her, and if it wasn't the same position, her rate of pay would remain unchanged.

On or about May 2, 2005 or May 9, 2005, plaintiff was placed off work with an expected return to work date of October of 2005. At the end of September, 2005, plaintiff notified her employer that she would be able to return to work in October, 2005. The following day she was notified that her FMLA had been exhausted, her position no longer existed, and there was no employment available to plaintiff. Yet, following plaintiff's termination, Defendant hired at least two new employees.

Had plaintiff not gone off work because of her pregnant condition, or had Plaintiff not become pregnant, plaintiff would still be employed by defendant. Plaintiff, upon information and belief, is the only employee who was treated in this manner, and not allowed to return to work following early

disability or maternity leave. Based upon the foregoing, Plaintiff asserts that defendant's termination was an unlawful discriminatory practice which denied her equal terms, conditions and privileges of employment because of her sex (pregnancy).

(Interrogatory No. 5, Plaintiff's Response to Defendant's First Set of…Interrogatories (undated), attached as Ex. 27 to Defendant's statement of facts.) Plaintiff filed a complaint with the Equal Employment Opportunity Commission and it was investigated and denied. She subsequently filed the pending lawsuit.

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden

by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the nonmoving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the

party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Title VII

Under Title VII, 42 U.S.C. § 2000e, a plaintiff must prove the following four elements in order to state a *prima facie* case of employment discrimination based on pregnancy: "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d. Cir. 1995) (internal citations omitted). "Alternatively, a plaintiff may satisfy the fourth requirement by showing that the discharge occurred in

circumstances giving rise to an inference of unlawful discrimination." *Id.* "The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983).

In reviewing a motion for summary judgment, the Court applies the burden-shifting rules set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Plaintiff has the initial minimal burden of making out a *prima facie* case. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997).

> If a plaintiff establishes a *prima facie* case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *See McDonnell Douglas*, 411 U.S. at 802-03; *James* [v. *New York Racing Ass'n*], 233 F.3d [149] at 154; *Quaratino*, 71 F.3d at 64. The defendant is not required to prove that the articulated reason actually motivated its actions. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the *prima facie* case are not contested)." *James*, 233 F.3d at 154.…

*Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001).

> "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated…remains at all times with the plaintiff.'" *St. Mary's* [*Honor Ctr. v. Hicks*], 509 U.S. [502] at 507 [1993] (quoting *Burdine*, 450 U.S. at 253). Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination. *See St. Mary's*, 509 U.S. at 510-11; *Burdine*, 450 U.S. at 255-56; *Fisher*, 114 F.3d at 1336. In sum, our holding in *Fisher* was that once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from

which the factfinder can reasonably find the essential elements of the claim.

*James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

**New York Human Rights Law**

Plaintiff also makes a claim under the New York State Human Rights Law, codified at New York Executive Law § 296. That statute makes it an unlawful discriminatory practice

> for an employer or licensing agency, because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law section 296(1)(a) (1996). The Court notes that the elements of Title VII and New York Discrimination Law claims "can be analyzed, for purposes of determining sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998).

**Americans with Disabilities Act**

To establish a claim under the Americans with Disabilities Act ("ADA"), a plaintiff must prove (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA; (3) the plaintiff could perform the essential functions of his job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998). In the ADA,

(2) Disability. The term "disability" means, with respect to an individual—

     (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

     (B) a record of such an impairment; or

     (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102 (2008), P.L. 110-325, Sec. 4(a) (Sept. 25, 2008). As with a Title VII claim, the Court applies the burden-shifting rules of *McDonnell Douglas*.

## ANALYSIS

CooperVision argues in its memorandum of law that,

> [s]ummary judgment in favor of CooperVision is mandated because the unrefuted evidence demonstrates that there is no genuine issue of material fact that plaintiff cannot establish a prima facie case of sex or disability discrimination, nor can she offer evidence demonstrating that CooperVision's business reasons for the challenged employment actions are pretextual. As a result, all of plaintiff['s] claims against CooperVision must be dismissed.

(Def.'s Mem. of Law, at 1.) The Court agrees.

The parties do not dispute that Plaintiff was a pregnant female and thus occupied a position in a protected class under Title VII. Moreover, there is no dispute that she performed her duties satisfactorily, and that she was ultimately discharged. In dispute is whether the March 2005 restructuring of the corporation and Plaintiff's resulting transfer in April 2005 to a nonmanagerial position, after she had informed CooperVision in January 2005 that she was pregnant, was as a result of sex discrimination. Also in dispute is whether her eventual discharge was discriminatory.

### A

In regard to the transfer, CooperVision contends that, "[o]ther than the mere allegation that CooperVision was aware of her pregnancy at the time of the transfer, there are simply no allegations or facts in the record sufficient to raise an inference of discrimination with respect to the transfer." (Def.'s Mem. of Law, at 10.) Plaintiff counters that, since the change of position eliminated her manager title, diminished her responsibilities and participation in bonuses, the transfer was an adverse employment action. (Pl.'s Mem. of Law, at 16.) She also contends that the transfer occurred one week after her return from a week's leave as a result of complications from her pregnancy and that she had to train the individuals who eventually assumed her duties when she was out. In *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123 (2d Cir. 2004), the court wrote:

> Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices…unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (ellipsis in original) (citations omitted).

*Williams*, 368 F.3d at 128. CooperVision points out that at the same time Plaintiff was transferred, another female employee, who was not pregnant, was terminated, and maintains that the restructuring was the result of a managerial decision to remove nonfinance jobs from the Commercial Finance area, and that it was also impacted by CooperVision's acquisition of OSI.

The Court is aware that proximity in time between an announcement of pregnancy and an adverse employment action can create an inference of sex discrimination.

*See Santossuosso v. NovaCare Rehab.*, 462 F. Supp. 2d 590 (D.N.J. 2006) (approximately one month between announcement of pregnancy and adverse transfer). Although the burden of establishing a *prima facie* case is minimal, the Court finds that the elapsed time between Plaintiff's announcement of her pregnancy in January and the actual transfer in April is insufficient to infer that the transfer was a result of sex discrimination. Moreover, although her participation in bonuses was effected when she lost her managerial title, Plaintiff's supervisor had her salary raised to the point that it then exceeded what she would have earned if she had continued to participate in bonuses. Finally, it is undisputed that another nonpregnant female employee was terminated as a result of the same restructuring decisions. Accordingly, even viewing the evidence in the light most favorable to the plaintiff, the Court determines that she has failed in her minimal burden of showing that the transfer was as a result of sex discrimination. *See*, *e.g.*, *Rinsler v. Sony Pictures Entertainment, Inc.*, No. 02-Civ. 4096(SAS), 2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003) (three-month period between announcement of pregnancy and demotion insufficient in itself to raise inference of discrimination based on sex).

Furthermore, even if Plaintiff had proven a *prima facie* case with regard to the transfer, CooperVision has come forward with nondiscriminatory reasons for the transfer, and Plaintiff has failed to raise an issue of fact, as to whether the reasons were false and that discrimination was the true reason for her transfer. More specficially, Plaintiff was experiencing complications in her pregnancy such that from March 22 through March 29, 2005, her doctors removed her from work. When she returned, she states that, "I was notified and began my transition from Commercial Finance to

Marketing Administration." (DeMarco Aff. ¶ 29, attached as Tab 1 to Pl.'s statement of

facts.) During her transfer, and

> [f]or the next month, I continued to perform many of the same duties I had when I held the position of Commercial Finance Manager, however, during that same time my supervisor, Laurie Dodge, began transitioning many of my various job duties to Defendant's other employees and directed me to train those individuals to ensure that the "hole" was filled while I was gone. In fact, I trained Laurie Dodge herself, and Melanie Parnell on my duties that were transferred to the Marketing Administration Department, as well as Jane Evans on my duties that remained in Commercial Finance. In fact, after I went off work on disability leave I continued to receive calls from Melanie and Laurie inquiring on to how to perform certain tasks and duties, as well as vendors that I had been working with.

(*Id*. ¶ 30.) Plaintiff has not raised an issue of fact with respect to CooperVision's

explanation that her transfer occurred because David Shaffer, the newly-appointed

director of commercial finance, wanted to eliminate nonfinance job functions from the

commercial finance department and because of CooperVision's acquisition of OSI. (*See*

DeMarco Aff. ¶¶ 22-23 ("several changes" made in the commercial finance department;

Monica Buholtz fired;[6] Shaffer "was working closely with Mike Menard, Jeff McLean, and

Tom Shone, attempting to find ways to make Defendant more efficient and profitable.").)

**B**

Turning to her discharge, the Court finds that Plaintiff has established a prima

facie case.  In that regard, the Court determines that Plaintiff has raised an inference

that her termination was a result of sex discrimination. The termination took place after

Plaintiff had been previously assured by Shone there would be plenty of work when she

---

[6]Menard, in his Reply Affidavit, states that Buholtz's position was eliminated, not that she was terminated for performance reasons. (Menard Reply Aff. ¶ 10.)

returned, after she received further assurances by Menard[7] the day before she was terminated, and after she returned from a disability leave of six months in duration (as a result of complications from her pregnancy). Viewing the evidence in the light most favorable to Plaintiff, the Court finds she has raised an inference of discrimination with regard to the termination in October 2005.

CooperVision, though, has come forward with, what it maintains, are nondiscriminatory business judgment, reasons for elimination of Plaintiff's former position and her ultimate discharge from employment. Plaintiff, relying on the Second Circuit's holding in *Montana v. First Federal Sav. & Loan Asso.*, 869 F.2d 100, 106 (2d Cir. N.Y. 1989), Plaintiff counters that CooperVision's business judgment reasons for eliminating Plaintiff's position are pretextual. (Def.'s Mem. of Law, at 23.) The facts in *Montana*, however, are distinguishable. In *Montana*, the Court of Appeals noted,

> First, at the time of her discharge, Montana was the oldest and highest paid nonclerical employee in First Federal's personnel department. Second, she was the only department head whose position was consolidated into the corporate headquarters at Rochester and whose staff continued without her. Third, she was not offered the opportunity to transfer to Rochester. Fourth, after her termination, her duties were not eliminated; instead, the bulk of her duties were reassigned to a coworker, Rossi, who was thirty years younger. Even before assuming these added responsibilities, Rossi had worked overtime on a regular basis. By taking on Montana's responsibilities, Ms. Rossi's workload increased by 15-20 percent. Moreover, because these additional duties overburdened Rossi, many of her duties were subsequently distributed to another younger, newly hired personnel employee. Fifth, when First Federal took over the personnel functions of its wholly owned subsidiary, HWD, and created the position of compensation analyst, it failed even to consider Montana for that position although she was qualified for it. Finally, after Montana's

---

[7]Plaintiff contends that when she informed him she was returning to work, Menard responded, 'oh, good, we'll figure out what we're going to do.'" (Pl.'s Statement of Disputed Facts ¶ 35.)

discharge, purportedly as part of a reduction in force, First Federal increased the number of employees in its personnel department by three, adding the positions of compensation analyst, assistant compensation analyst, and pension administrator. Still, Montana was neither offered a position nor even considered for those positions.

*Id.*, at 105-06. Here, by contrast, the company's FMLA policy explained that if an employee's absence exceeded twelve weeks, the employee's return would be based on the needs of the department. Plaintiff does not dispute that this information was provided to her in an April 24, 2005, email, five days before she departed on disability leave. Thus, Plaintiff's argument that she was informed of her exhaustion of the twelve-week period only on September 27, 2005, is inaccurate. (Pl.'s Mem. of Law, at 18.)

With regard to Plaintiff's contention that a nonpregnant female replaced her, she related a conversation she had with Melanie Parnell, an employee who had assumed some of Plaintiff's duties. According to Plaintiff, Parnell told her that CooperVision "was guaranteeing [Parnell] [Plaintiff's] position and that she [Parnell] was going to remain in the Marketing Administration Department permanently." (*Id.* ¶ 32.)

CooperVision filed a reply affidavit by Melanie Parnell in which she disputes any contention that she took over Plaintiff's position, or told Plaintiff that she was guaranteed such position in the Marketing Administration Department. On this issue, CooperVision cites to Plaintiff's own deposition testimony:

Q You mentioned a conversation that Melanie had with somebody about guaranteeing a position or whatever. How do you know about that?

A I discussed it with Melanie.

Q What was the conversation? When did you have it?

A I don't remember when I had it. It was over the summer and—

Q Over 2005?

A Over the summer of 2005 I was questioning when Melanie had called
me one day I said, you know, do you think I'm going to be doing the same
thing because she was saying she didn't like doing it and she couldn't wait
until I got back. And she said, well, they permanently moved me into this
department and I asked her what she meant and she said they told her
that she was going to be a permanent fixture, not to worry about it. They
would have work for her even when I came back.

(DeMarco Dep., at 178-79, attached to Parnell Reply Aff. as Ex. 32.) Parnell's

Personnel Change Notice shows that on March 14, 2005, she was moved from her old

position of Executive Assistant in the Executive Americas department, to a new position

of Sales Administrator in the Sales Administration department, working for Tracy

Havens. (Personnel Change Notice (Mar. 14, 2005), at 1, attached as Ex. 31 to Parnell

Reply Aff.) Parnell was subsequently titled Promotional Administrative Assistant in a

Personnel Change Notice dated Nov. 1, 2005. (Personnel Change Notice (Nov. 1,

2005), at 1, attached as Ex. 33 to Parnell Reply Aff.)   Therefore, the undisputed

evidence does not support Plaintiff's contention that CooperVision replaced Plaintiff with

Parnell. Parnell, like others, assumed some of Plaintiff's duties, but not all of them, nor

did Parnell assume Plaintiff's title.

As to any assurances Plaintiff received concerning her job, Menard explains in

his reply affidavit that during the reorganization, CooperVision decided that brand

marketing managers would take over distribution of the trial racks of contact lenses for

their own brands to help eliminate redundancies and get the brand managers closer to

their customers. (Menard Reply Aff. ¶ 16.) This decision resulted in a major

diminishment of Plaintiff's job, although she was still expected to handle the rebate

programs and key account programs, vendor relations and promotions work. (*Id*. ¶ 17.)

Menard further states that in April 2005, CooperVision believed "that the marketing organization would grow and expand" as the company "integrated the marketing of OSI customers and potential customers." (*Id*. ¶ 18.) This thought formed the basis for Shone's assurances to Plaintiff in April that there would be plenty of work. (*Id*.) Menard explained that when Plaintiff, "told us she was coming back, we were confronted with determining whether, in light of this difficult economic reality, we could continue her position. Candidly, by that time, the decision was not difficult to make." (Menard Reply Aff., ¶ 35.)

From April through September, while Plaintiff was out on leave, Parnell handled the clerical portions of Plaintiff's responsibilities, and Plaintiff's supervisor, Dodge, handled the higher level responsibilities. (*Id*. ¶ 26.) Two employees in CooperVision's global pricing organization were, a month after Plaintiff's position was eliminated, moved to the Marketing Administration Department to handle list pricing issues, price controls and special pricing promotions. (*Id*. ¶ 29.) Menard states that this occurred so all pricing functions were then controlled from one department under Dodge, who was in charge of pricing management in the United States. (*Id*. ¶ 30.) These two employees were not replaced in their prior department. Another employee in the Global Customer Service Department at CooperVision was moved to the Sales Administration Department to handle tasks requiring strong technical knowledge of Excel, Access, Business Objects and SQL Query Analysis, to work on the BP Mapping project. (*Id*. ¶ 28.)

The Court is aware that it "is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith." *Montana*, 869 F.2d at 106. Here, CooperVision's nondiscriminatory reasons for elimination of Plaintiff's former job

are not rebutted by Plaintiff. Relying primarily on the timing, Plaintiff has failed to show that CooperVision's proffered reason is false, and that the real reason for elimination of her job was discrimination. Even viewing the evidence in the light most favorable to Plaintiff, the Court determines that Defendants are entitled to summary judgment on the Title VII claim.

## C

Plaintiff has also raised a claim under the ADA. In order to make out a *prima facie* case of a violation of that Act, Plaintiff must show, *inter alia*, that she is disabled as that term is defined in the Act. Plaintiff has failed to present evidentiary proof in admissible form that she suffers from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(2)(A). Her affidavit describes her condition during pregnancy and the need for complete bed rest. The only medically-related exhibits are: (1) a note from April 29, 2005, in which Dr. Albert Jones expected that Plaintiff would be "[d]isabled until 8 weeks after delivery. Expected delivery date 9/9/05" (Def.'s Ex. 16, at 2); and (2) two prescription pad notes signed by someone with an illegible hand, one stating that Plaintiff was to be out of work March 22-29, 2005, and another, dated September 21, 2005, stating that Plaintiff would continue disability "until Oct 28 related to complications of delivery" (Def.'s Ex. 17). Because this case is before the Court on summary judgment, only evidentiary proof in admissible form can be considered. The record contains no affidavit or deposition testimony from Plaintiff's doctor, or any other medical provider. As this Court has previously observed, "Plaintiff's mere allegation that she was 'disabled,' without supporting medical evidence, is insufficient to create a genuine issue as to whether she was substantially limited in any

major life activity." *Curry v. Fed. Express Corp.*, No. 03-CV-619S, 2006 U.S. Dist. LEXIS

22986 (W.D.N.Y. Mar. 27, 2006). Further,

> The law is clear that doctors' letters are "inadmissible hearsay and may not properly be considered." *Burgos v. City of Rochester*, No. 99-CV-6480, 2003 U.S. Dist. LEXIS 22454, 2003 WL 22956907, at *3 (W.D.N.Y. Mar. 31, 2003); *see also Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 391 (S.D.N.Y. 1998) (granting summary judgment in an ADA case where the only medical evidence relied upon were inadmissible hearsay doctor letters).

*Curry*, 2006 U.S. Dist. LEXIS 22986, *29; *see, e.g., Gage v. United States*, No.

1:05CV2902, 2008 U.S. Dist. LEXIS 27913, *11 (N.D. Ohio Apr. 7, 2008) ("The record is

wholly devoid of any medical evidence. Plaintiff has failed to present an affidavit and

fails to cite to relevant deposition testimony that would satisfy her *prima facie*

requirements. There is no testimony or competent medical evidence cited by Plaintiff

that describes the seriousness of her injuries that would permit this court find her

injuries are substantially limiting a major life activity.").

Plaintiff cites to *Hernandez v. City of Hartford*, 959 F. Supp. 125 (D. Ct. 1997) in

support of her argument that the complications from her pregnancy qualified as a

disability under the ADA. In that case, however, it appears that evidentiary proof[8] from

the plaintiff's gynecologist was included. *Id*. 959 F. Supp. at 131. Plaintiff also cites to

*Cerrato v. Durham*, 941 F. Supp. 388 (S.D.N.Y. 1996), but that case involved a motion

to dismiss, where the district court held that the plaintiff had *alleged* sufficient facts to

avoid dismissal. *Id*. 941 F. Supp. at 393. Likewise, Plaintiff's reliance on *Patterson v.*

---

[8]"The nature and severity of plaintiff's impairment is evidenced in the note from her gynecologist. (Pl.'s Ex. E.) It confirmed the nature of her condition, the dangers involved and suggested that she work at home because of her condition. (*Id*.)" *Hernandez*, 959 F. Supp. at 131.

*Xerox Corp.*, 901 F. Supp. 274 (N.D. Ill. 1995), is also misplaced. That case also was decided under the standards applicable to a motion to dismiss, not summary judgment. The district court held only, "that the complaint sufficiently alleges a 'disability' to survive a motion to dismiss." *Id.* at 278.

Moreover, even if the doctor's notes were admissible, the notes do not prove the existence of a physical or mental impairment that substantially limited a major life activity. Even in combination with Plaintiff's testimony, there is no material issue of fact raised with respect to whether Plaintiff qualifies as disabled under the Act:

> Q Okay. Let me ask you in terms of your medical condition at the time that you were on disability. Was there anything that you couldn't do that you could do before? Obviously you weren't working I understand that, but were you able to care for yourself?
>
> A I was able to shower as long as somebody was home to make sure I didn't get off balance. I wasn't able to clean my house. Taking care of my son I needed help to take care of him, lifting him and things of that nature. Later on in the pregnancy I had to be driven. I was supposed to be on bed rest as much as I could.
>
> Q Okay. And once after the successful birth of your children did that—did those conditions go away?
>
> A They went away after the first couple weeks. I had postpartum hemorrhage so that's why I had to relax a little bit longer, but I'd say after two weeks after having the babies.

(DeMarco Dep. 188-89.) The Supreme Court set out a three-step approach for determining whether a plaintiff meets the definition of a "disability" based on a physical or mental impairment. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). First, the Court must determine whether a plaintiff suffers from a qualifying physical or mental impair-ment. *Bragdon*, 524 U.S. at 631. Second, the Court must identify the activity that the plaintiff claims is impaired, and then determine whether that activity constitutes a "major

life activity." *Id*. Third, the Court must determine whether the plaintiff's impairment "substantially limited" the identified major life activity. *Id*.

The EEOC has issued regulations interpreting the ADA, which define "physical impairment" as "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1) (56 F.R. 35734, Jul. 26, 1991). No evidentiary proof, inadmissible or admissible, provides a basis for the Court to reach the conclusions argued by Plaintiff in her memorandum of law. (Pl.'s Mem. of Law, at 21.)

## CONCLUSION

Defendant's motion (Docket No. 14) for summary judgment is granted, and the case is dismissed. The Clerk is directed to enter judgment for Defendant.

IT IS SO ORDERED.

Dated:   March 11, 2009
         Rochester, New York

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge